## FOWKES v. J. I. CASE THRESHING MACH. CO., et al.

No. 2719. Decided July 30, 1915. (151 Pac. 53.)

1. HIGHWAYS—REGULATION—SPEED OF AUTOMOBILE. Although Laws 1909, c. 113 (Laws 1911, c. 131), make it lawful to operate an automobile along a country road at a speed of twenty miles an hour, operating an automobile at a less speed may, under some circumstances, constitute negligence.[1] (Page 509.)

2. HIGHWAYS—ACTION FOR INJURIES—EVIDENCE—SPEED OF AUTOMOBILE. In an action for injuries to plaintiff while riding on a highway on a load of hay caused by defendant's automobile striking the horses and causing them to run away, evidence *held* insufficient to support a finding that the automobile was operated at a negligent and excessive speed. (Page 509.)

3. HIGHWAYS—ACTION FOR INJURIES—EVIDENCE—SUFFICIENCY. In an action for injuries to plaintiff, while riding on a highway, in a runaway caused by defendant's automobile, evidence *held* insufficient to support a finding that plaintiff's horse was struck by the automobile. (Page 510.)

[1]*Lockhead v. Jensen*, 42 Utah 99, 129 Pac. 347.

4. HIGHWAYS—ACTIONS—EVIDENCE—SUFFICIENCY—WARNING. In an action for injuries to plaintiff in a runaway caused by defendant's automobile passing him on the highway, evidence *held* sufficient to show that defendant failed to sound the horn of the automobile, as required by statute.   (Page 511.)

5. HIGHWAYS—ACTIONS—EVIDENCE—SUFFICIENCY—LAW OF ROAD. In an action for injuries to plaintiff in a runaway caused by defendant's automobile, evidence *held* to sustain a finding that the automobile passed plaintiff on the wrong side.   (Page 511.)

6. APPEAL AND ERROR—REVERSAL—GROUNDS—FINDINGS NOT SUPPORTED BY EVIDENCE. In action for personal injuries due to a collision between a wagon upon which plaintiff was riding and defendant's automobile on a highway, where the court submitted several issues of negligence to the jury, a judgment for plaintiff will be reversed where several of the findings were not supported by evidence.   (Page 511.)

7. MASTER AND SERVANT—LIABILITY FOR ACTS OF SERVANT—PERSONAL INJURIES—SCOPE OF EMPLOYMENT. In an action for injuries to plaintiff in a runaway caused by an automobile, evidence on the issue whether the driver of the automobile was acting within the scope of his employment as defendant's servant *held* to require the direction of a verdict for defendant.   (Page 511.)

Appeal from District Court, Fifth District; *Hon. Joshua Greenwood,* Judge.

Action by John Fowkes against the J. I. Case Threshing Machine Company and another.

Judgment for plaintiff.   Defendants appeal.

REVERSED and remanded.

*C. S. Varian,* for appellant.

*J. H. McKnight,* for respondent.

### APPELLANT'S POINTS.

The master is not liable for injuries occasioned to a third person by the negligence of his servant, while the latter is engaged in some act beyond the scope of his employment, for his own purpose, or for the *purpose of another,* although he may be using the instrumentalities furnished him by the

master with which to perform the ordinary duties of his employment. (*Slater* v. *Advance Thresher Co.*, 97 Minn. 305; 107 N. W. 133; *Morier* v. *R. R. Co.*, 31 Minn. 351; 17 N. W. 952.)

The phrase, "in the course (scope) of his employment," is not used synonymously with "during the period of his employment." If it were otherwise, the master would be liable for all of the tortuous acts of his servant during the period of service. (Cases last cited.) The test must always be, was the servant acting within the scope or course of the employment at the time of the acts complained of, and, therefore, it would seem to follow, as said by an English court, "that a servant can only be acting within the employment of the master so long as he is doing some act with his master's assent." (*Storey* v. *Asnton*, 38 L. J. Q. B. 223.)

A master has the right to select and choose his agents, and to determine himself, and to assign to the servants so selected, their respective duties, and no assumption by an employee of duties not assigned to him will bring those duties within the course or scope of his employment *as defined by the master,* and when an act is not within the scope of a servant's employment, it can not be within either the express or implied authorization of the master. (*Lima Co.* v. *Little,* 67 Oh. St. 91; 65 N. E. 861-864.)

STRAUP, C. J.

The plantiff brought this action to recover damages for alleged personal injuries. He had judgment against both defendants. They separately appeal. The accident occurred near Mona, Juab County, Utah, on a highway, where the plaintiff was driving a team of horses and wagon, and where the defendant Roberts passed him in an automobile. The alleged negligence is that Roberts, before attempting to pass the plaintiff, failed to sound the horn of the automobile, traveled at an excessive and negligent speed, "about twenty miles an hour," passed the plaintiff on the wrong side, and, in passing, struck one of plaintiff's horses with the automobile, by reason of which the plaintiff's team became frightened and unmanageable, ran away, threw the plaintiff off the wagon

and injured him. It further is alleged that Roberts was an agent and servant of the other defendant, the Case Company, and, as such, at the time of the injury, was in the course of his employment, driving the automobile for it. The contention made by Roberts is that the evidence is insufficient to establish the alleged negligence and that error was committed in the charge to the jury. The same contentions are made by the Case Company, and, in addition, that the proof fails to show that it was responsible for Roberts' acts in driving and operating the automobile.

The plaintiff had a small load of hay on the wagon and was traveling south. The highway was raised in the center and sloped on either side to a ditch. It was about 150 feet wide; the traveled portion of it about twenty feet wide. The plaintiff was seated on the hay on the front part of the wagon, and, as he testified, was driving along about the center of the road. He did not hear the automobile horn sounded, and had no knowledge of the presence of the automobile until in passing him on the right, or west, side it was about even with the horses. His team became frightened, the off horse lunging and crowding towards the other horse, and became unmanageable and ran away, throwing the plaintiff out and injuring him. Two other witnesses for the plaintiff, two boys, testified that they were loading brush in a field about seventy feet from the road and about seventy-five yards from the place of the accident. They saw the automobile approach, heard no "toot of the horn," saw it pass the plaintiff on the right, or west, side, and that it was driven by Roberts, with whom was a woman companion, saw the team frightened and run away, the plaintiff thrown out, and the automobile pass on without stopping. One of them testified that the speed of the automobile, as it passed the plaintiff was not slackened. When asked how fast it went, he answered, "About like they always go." Another witness for the plaintiff testified that he saw the automobile pass his place about a quarter of a mile south of the place of the accident. He was asked by plaintiff's counsel: "How fast was the auto traveling then as compared with the speed of a train?" He answered: "It was traveling much faster than a passenger train generally travels passing

our place.'' On cross-examination he was asked and he answered:

"Q. And you say the auto was going faster than a railroad train? A. In my judgment. Q. How fast does the railroad train go that you measure by? A. I don't know. I don't know the time of the train. Q. Only you think it was faster than a railroad train? A. Yes, sir; it would be going faster. Q. Is there a station at Mona? A. Yes, sir. (About three miles by wagon road to his house, but the train passed his house within a half mile.) Q. Of course, you don't know how fast the automobile was traveling when it came up behind the wagon?. A. No, sir. Q. You don't know that? A. No, sir. Q. It was a quarter of a mile away when you think it was going faster than a railroad train, and you don't know how fast a railroad train runs, do you? A. I don't know.''

On redirect he was asked and he answered:

"Q. Now as to the speed the train travels—did you ever ride on a train from Mona here (Nephi), or here to Mona? A. Yes, sir. Q. How far is it from here to Mona? A. Seven and a half miles. Q. How long does it take a train to travel that? A. About ten or twelve minutes, I guess. Q. Not more than fifteen minutes? A. Not more than fifteen minutes. Q. When you were thinking about the speed of a train, that is the speed you were thinking? A. Yes, sir. Q. When the train travels between here and Mona? A. Yes, sir.''

That is all the proof on the part of the plaintiff to show the speed of the automobile at the time of the injury. This witness also testified that as soon as the automobile had passed him he went back to the place of the accident and there saw where the automobile had passed the plaintiff's team and wagon; that the automobile tracks came back into the road about ten feet from where the wagon tracks had left the road; that the distance between the automobile track and the wagon track where the latter left the road was about three feet; that the nearest horse track at that place to the automobile track was about five inches; and that the fender of the automobile extended about five inches over the wheel of the auto- mobile. That was all the evidence to show that the automobile struck one of plaintiff's horses.

The Case Company, a corporation of Racine, Wis., was engaged in manufacturing and selling threshing machines and automobiles. It had a local agent or dealer at Oasis, Millard County, a railroad station about ninety-two miles south of the place of the accident, and about 170 miles south of Salt Lake City. His name is Huff. Roberts was a salesman of the Case Company. He lived at Grantsville, Utah, a town about twenty miles west of Salt Lake City. The character of his employment was evidenced by a written contract between him and the Case Company. The material parts of it are: The Case Company "does hereby engage the services" of Roberts, "as a salesman, expert and collector," for a stated time and at a stated monthly salary, "and actual traveling expenses when absent from home"; Roberts "to devote his whole time and attention to the services of" the Case Company "as salesman, expert and collector or in any other capacity in which" the Case Company "might require his services." A Case automobile was sold to one Morgan, residing at Oasis. He purchased it from Huff, for $1,272. He, however, gave Huff his check for $1,625 and about $75 in cash for extras. Huff threw off his commission and paid back to Morgan the difference between $1,625 and $1,272. One of the Case Company's printed automobile "order blanks" was filled out. So far as material, the order is:

"Automobile Order Blank.

"Oasis, Utah, April 12, 1913.

"J. I. Case T. M. Company, Racine, Wisconsin: You will please ship or deliver on or before the 15 day of April, 1913 (or as soon thereafter as you can furnish for transportation or delivery), to Salt Lake (name of railway station), or other convenient station in the state of Utah, in care of J. I. Case T. M. Co. (dealer or company), one Case 30 H touring automobile to be equipped," etc., and "for which I agree to pay the sum of $1,272.00 and freight charges thereon from the factory. I hand you herewith $1,272." as the purchase price.

After further provisions, the order recites:

"We are not responsible to the purchaser of our goods for any undertakings, promises or warranties made by our representatives, beyond those expressed herein. *   *   *   Our

responsibility ceases when we deliver cars to a railroad company and have its receipt for them in good order.''

The order contains further provisions not here material. It is signed, not by Morgan, but by Huff as the purchaser. It also is signed at the bottom by Roberts, in print, "I assisted in taking this order and witnessed all signatures," then his name, "E. H. Roberts," in writing, after which, in print, "signature of salesman." Morgan did not sign the order, nor does his name in any manner appear in it. It, on its face, purports to be a direct contract of purchase by Huff from the Case Company. On the back of the order is endorsed: "For account of Henry Huff, at Oasis, state of Utah." "Order of Henry Huff." "Order receive at Office in Racine, June 2, 1913." "Accepted June 9th, 1913." "Checked June 27, 1913." Morgan testified that Huff sold him the automobile, and that he paid him the money, but that he made the "agreement jointly with both" Huff and Roberts, and that both were present when the order was signed. He further testified that, when the order was signed, it was agreed between them that the automobile was to be delivered to him at Oasis, and that, as Roberts "was going to Salt Lake anyhow, he would bring the car down when he came back."

Roberts testified that he drove the automobile from Salt Lake to Oasis. Where, or from whom he got the car, is not shown. He got it on the 17th or 18th of April. The accident occurred on the 19th, nearly two months before the order was received by the Case Company, and more than two months before the automobile was checked out. He drove from Salt Lake to Provo. There he took with him an agent of a lumber company and a salesman of the Case Company. He left them at Springville. From there he took with him to Oasis a lady corset canvasser. She accompanied him all the way, and was with him at the time of the accident. Roberts, on the way, but not on his direct route, visited Scipio and Holden, small settlements, where he did some soliciting for threshing machines and automobiles. His version of the accident and that of his companion is this: When they, on the highway, overtook the plaintiff, they were traveling about fifteen or seventeen miles an hour. Roberts sounded the automobile horn

several times. He disengaged the clutch, applied the brake, and slowed down. The plaintiff drew his team to the left, as Roberts thought, to let him pass on the right side, and for that reason passed the plaintiff on that side. In passing him, he slowed down to about ten miles an hour. When the automobile was even with the team, the horses became frightened, the off horse plunging and crowding toward the other horse. Roberts accelerated the speed to about twelve or thirteen miles an hour in order to pass and to get away from the team. After he had passed a short distance, he looked back, saw the team run, and, seeing a man running after it, believed it was the plaintiff and thought no one was hurt. Both testified that the automobile did not strike the plaintiff's horse. Roberts further testified that, because of the slope of the road at the place where he passed the plaintiff, it would have been impossible to operate the automobile at twenty miles an hour without upsetting it or skidding across the road. He delivered the automobile in good condition and without blemish to Morgan on the 22d of April.

The court submitted the case to the jury on all the alleged acts of negligence, the alleged excessive and negligent speed, striking the plaintiff's horse, passing him on the wrong side, and failing to sound the horn of the automobile. We do not find sufficient evidence to·support the first two.    **1, 2** Under the statute (Laws 1909, c. 113; Laws 1911, c. 131) it was lawful to operate an automobile along such a place as where the accident occurred at twenty miles an hour. True, operating an automobile at a speed less than that prescribed by statute may, nevertheless, under given circumstances, be negligent. *Lochhead* v. *Jensen,* 42 Utah, 99, 129 Pac. 347. But the plaintiff's proof does not show at what speed the automobile was operated, and hence it was not shown that it was operated at an excessive or negligent speed. The testimony of the boy that it went "about like they always go" does not indicate anything, unless it be assumed, which cannot be done, that automobiles are always operated at an excessive and negligent speed. Then there is the testimony of the other witness who saw the automobile pass about a quarter of a mile south of the place of the accident. Assuming

that the speed of an automobile a quarter of a mile from the place of the accident is some evidence as to its speed at the place of the accident—which is doubtful, Huddy on Automobiles (3d Ed.) Section 181—still such evidence has little, if any, weight or relevancy as against direct evidence showing the speed at the place of the accident, unless it be shown that the speed between the two places was not materially diminished or accelerated. No doubt a lay witness, experienced with, or accustomed to observe, moving objects, may give his opinion as to the speed of an automobile. Sufficient was shown to qualify the witness to give such an opinion. He, however, was not asked for it, nor did he express any. He, in a way, compared the speed of the automobile with the speed of trains he saw passing his place. But when asked, on cross-examination, how fast the trains ran, he said he did not know. On redirect he stated that he thought of a speed at which trains ran from Mona to Nephi, a distance of seven and one-half miles, in about fifteen minutes. From that it is argued that the trains he saw passing ran thirty miles an hour, and that the automobile went faster than that. To support the argument must it be assumed without proof that trains passing his place ran at the average speed between Nephi and Mona. If the witness had a reliable opinion as to the speed of the automobile, it ought not to have been difficult to have stated it. While his testimony was not necessarily irrelevant or incompetent because he could not, and did not, state the speed in miles per hour, yet, when he undertook to testify to a relative or comparative speed, the standard of rapidity with which he attempted to make the comparison ought itself to have had a reasonable degree of certainty. The testimony leaves the standard to mere argument. On that is based the speed of the automobile—one inference on another. We think it insufficient to prove the alleged negligent speed. The defendants' evidence was that the automobile, in passing plaintiff, was operated at but ten miles an hour. Plaintiff's case in such particular was therefore not strengthened by the defendant's evidence.

We have already referred to the evidence offered to support the allegations that plaintiff's horse was struck

by the automobile. We think it insufficient to support
it. Both of these allegations of negligence ought to have been
withheld.

We think there is sufficient evidence to support the allegations that Roberts failed to sound the horn of the automobile and that he passed the plaintiff on the wrong side. The statute requires one operating an automobile to sound the horn of the automobile within fifty and not to exceed one hundred yards distant from any person driving a **4, 5, 6** vehicle drawn by horses, which the motor vehicle may meet or overtake, and, in passing him, to pass on the left side. There is evidence to show that the horn was not sounded. The evidence also shows that the automobile passed the plaintiff on the right side. True, Roberts testified that the plaintiff drew his team to the left, indicating a desire to let the automobile pass on the right side; but that is disputed. Since, however, the court submitted the case on all of the alleged negligence, the judgment, even as to Roberts, must be reversed, for it cannot be told whether the verdict is founded on but one, or on all, of the alleged acts of negligence.

We think the case was wrongfully submitted to the jury as to the Case Company, for it was not sufficiently shown that Roberts, in driving the automobile at the time of the accident, was discharging any duty, or transacting         **7** any business, or doing anything, for the Case Company. The New Hampshire court, in *Danforth* v. *Fisher*, 75 N. H. 111, 71 Atl. 535, 21 L. R. A. (N. S.) 93, 139 Am. St. Rep. 670, said that:

"The test to determine whether a master is liable to a stranger for the consequences of his servant's misconduct is to inquire whether the latter was doing what he was employed to do at the time he caused the injury complained of."

The Texas court, in *International & G. N. Ry. Co.* v. *Cooper,* 88 Tex. 608, 32 S. W. 517, that, to render the master liable, the act causing the injury "must be done in furtherance of the master's business and for the accomplishment of the object for which the servant is employed."

Other authorities, that:

"The universal test of the master's liability is whether there was

authority, express or implied, for doing the act; that is, was it one done in the course and within the scope of the servant's employment?" *Slater* v. *Advance Thresher Co.*, 97 Minn. 305, 107 N. W. 133, 5 L. R. A. (N. S.) 598.

All we have to determine the scope of Roberts' employment and as to whether. what he did was in furtherance of the Case Company's business, or for the accomplishment of an object for which he was employed, is the contract between him and the Case Company. From that it cannot be inferred or implied that Roberts was employed or was required, in the course of his employment, to deliver automobiles sold by him or in which he assisted in taking orders, by driving them through the country as here was done. Morgan, to whom he delivered the automobile, was a stranger to the Case Company. Huff, and not he, purchased the automobile from it. The Case Company agreed with Huff, not with Morgan, to deliver the automobile at Salt Lake City, not Oasis. Huff ordered the automobile on the 12th of April. The order was received on June 2d; but on the 17th or 18th of April Roberts procured a Case automobile, answering the description of the automobile described in the order, from some one in Salt Lake. Though it be inferred that it was from a dealer—there is no proof as to that—yet there is no proof to show the relation between such person and the Case Company. Certain it is that there is no proof to show that Roberts got the automobile from the Case Company, or that it, or any one on its behalf, intrusted the automobile to him for delivery. It is not made to appear that Roberts ever before made delivery of automobiles, or that he had any duties to perform in such respect. The Case Company did not obligate itself to deliver the automobile at Oasis, but Salt Lake City. The matter may be put thus: Huff ordered and purchased an automobile, not as an agent or dealer, but as a purchaser, from the Case Company, upon an agreement that the automobile be delivered at Salt Lake City. Huff sold the automobile to Morgan and agreed to deliver it to him at Oasis. Roberts, with Huff and Morgan, agreed to go to Salt Lake City and drive the automobile to Oasis. It not appearing that Roberts was employed to perform any such duties by the Case Company, or that the

company was required to deliver the automobile at Oasis, or
that it had intrusted the delivery of it to Roberts, there is not
anything to support a finding that Roberts, in making the
delivery, was then doing anything for the Case Company, or
doing anything within the scope or course of his employment.
The court hence ought to have directed a verdict in favor of
the company.

For these reasons, the judgment of the court below is
reversed, and the case remanded for a new trial. Costs to
the appellants.

FRICK and McCARTY, JJ., concur.